Filed 2/3/25  In re N.P. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re N.P., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E084475 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J293759, J293760 & J293761) |
| v. | OPINION |
| Z.O. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Lynne M. Poncin, Judge.  Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant, Z.O.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant, J.P.

Tom Bunton, County Counsel, Helena Rho, Deputy County Counsel, for Plaintiff and Respondent.

## I.  INTRODUCTION

Z.O. (Mother) and J.P. (Father) appeal from an order terminating their parental rights with respect to three children:  Ju.P., M.P., and N.P.  The only argument asserted on appeal is that the juvenile court abused its discretion by failing to apply the parental-benefit exception to termination of parental rights, which generally prohibits the termination of parental rights where the juvenile court "finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (Welf. & Inst. Code[1], § 366.26, subd. (c)(1)(B)(i).)  For the reasons set forth below, we find no abuse of discretion and affirm the order.

## II.  BACKGROUND

A.  *Facts and Procedural History*

Father and Mother are the parents of Ju.P., M.P., and N.P.  In July 2022, San Bernardino County Children and Family Services (CFS) filed a petition pursuant to section 300 on behalf of all three children, alleging that the children were at risk of harm as the result of (1) domestic violence in the home; (2) Mother's untreated mental health

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

2

issues; (3) both parents' ongoing struggle with substance abuse; and (4) Mother's loss of custody and failure to reunify with respect to the children's half siblings. In August 2022, the parties negotiated a mediated agreement with respect to the petitions. As a result, the juvenile court found true allegations that the children faced a substantial risk of harm due to domestic violence in the home and the parents unresolved substance abuse issues; formally ordered the children removed from parents' custody; and ordered that parents be given reunification services. However, the parents were unable to reunify within the statutory time period and the juvenile court set the matter for a selection and implementation hearing pursuant to section 366.26.

B. *Selection and Implementation Hearing*

On August 14, 2024, the juvenile court held a contested selection and implementation hearing. The juvenile court admitted into evidence: (1) status review report filed by CFS pursuant to section 366.21, subdivision (e); (2) additional information reports filed by CFS; (3) a bonding study conducted by a clinical psychologist; and (4) the section 366.26 report filed in advance of the hearing. The juvenile court also received live testimony from Mother and Father.

1. Six-Month Status Review Report

According to the six-month status review report filed pursuant to section 366.21, subdivision (e), all three children were placed in the home of maternal grandmother. Mother had regularly participated in reunification services and visitation, but did not appear to fully benefit from some of those services, evidenced by ongoing antagonistic

3

communications between Mother, Father, and maternal grandmother. Mother had tested negative for controlled substances, but Father did not. Additionally, a social worker reported witnessing ongoing domestic violence between the parents. As a result, CFS recommended that the children remain in out-of-home placement while parents received further reunification services.

2. Additional Information Reports

CFS filed an additional information report in February 2024. It informed the court that Mother and Father had tested negative for controlled substances thus far, but had yet to complete the full extent of court-ordered testing. However, social workers were provided a recording of an argument between Mother and Father during an unsupervised visit for N.P.'s birthday. In the recording, parents were heard yelling and cursing at each other in front of the children, while Ju.P. pleads with them to stop. Parents then abruptly ended N.P.'s birthday celebration as a result of their ongoing argument. When a social worker followed up with parents, Father was apologetic, but Mother was defensive and made comments that appeared to threaten the social worker with physical violence.[2] CFS was also informed that Mother intended to file a restraining order against Father and that the children had reported additional incidents of arguing during unsupervised visitation.

---

[2] Specifically, Mother accused the social worker of only reporting negative things about the parents and told the social worker "'that is why social workers get hurt'" on more than one occasion.

CFS filed a second additional information report in July 2024. A social worker reported on her observations during a supervised visit. During the visit, all parties engaged in appropriate interaction and showed affection for each other, but the children "did not appear to have a hard time saying bye to the parents." Social workers also reported that following the 18-month review hearing, Mother attempted to influence Ju.P. to "stop the adoption from happening" by surreptitiously giving Ju.P. a cell phone, initiating unsupervised contact with Ju.P., and attempting to pressure Ju.P. into expressing a desire not to be adopted.

3. Section 366.26 Report and Additional Information

In its section 366.26 report, CFS recommended that the juvenile court terminate Mother and Father's parental rights and select a permanent plan of adoption for the children. CFS reported that Ju.P. was almost age 12, M.P. was almost age 10 and N.P. was age 2. The children had been placed with maternal grandparents for nearly two years and "appear[ed] comfortable and well-adjusted to the home environment." Both maternal grandparents expressed that they had an emotional bond with the children and further expressed their desire to adopt the children. A social worker interviewed both Ju.P. and M.P. regarding the prospect of adoption. M.P. stated she felt "'relieved'" by the prospect that she might be adopted by her maternal grandparents, and Ju.P. expressed that she would prefer permanent adoption if she could not be fully returned to her parents' custody.

CFS also filed a final additional information report on the date of the section 366.26 hearing. CFS reported that Mother had recently been arrested and charged with inflicting corporal injury on a spouse (Pen. Code, § 273.5, subd. (a)) as the result of a domestic violence incident involving Father. CFS also reported that during a supervised visit the week prior to the hearing, Mother appeared to engage in an argument with M.P. in which mother made disparaging comments regarding maternal grandmother's ability to care for the children and M.P. verbally defended her maternal grandmother in response.

4. Bonding Study

According to the bonding study, a clinical psychologist documented her observations during a single supervised visitation session between Mother and the children. Based upon these observations, as well as the review of various reports, the psychologist opined that the children "engage in healthy attachment behaviors toward Mother"; that "[o]verall, the interactions between Mother and her children were positive, playful, reciprocal, and appropriate"; and that "severing contact could be detrimental" "[e]ven if not immediately destabilizing."

5. Live Testimony by Parents

Mother testified she had consistently participated in visits and had positive interactions with the children during visits. Prior to removal, Mother took the children to school, assisted with homework, accompanied them to recreational activities, and took them to medical appointments. When asked to describe what harm she believed the

children would suffer if the juvenile court were to terminate parental rights, Mother stated only: "Every child needs their parent. I know they need them in a healthy way."

On cross-examination, Mother was asked to specifically describe what special educational needs had been identified for her children, but she provided only generalized statements in response.[3] Mother also admitted that she continues to reside in the same home as Father, despite the fact that her inability to reunify was in part due to ongoing domestic violence between them.[4]

Father testified that he had maintained consistent visitation with the children during the dependency proceedings. He admitted that at one point the family had progressed to unsupervised visitation but reverted back to supervised visits after he tested positive for controlled substances. Father testified that he felt bonded with the children, the children displayed affection towards him, and the children called him "Dad."

6. Findings and Order

After the presentation of evidence, the parties argued only whether the parental-benefit exception set forth in section 366.26, subdivision (c)(1)(B)(i), applied such that selection of a permanent plan other than adoption was appropriate. Following argument,

---

[3] Specifically, Mother was asked: "Can you describe to me what is [*sic*] the specifics of the IEP [individualized education program] or generally what's in the IEP?" Mother responded: "In class, [M.P.]'ll get pulled out for certain amount of hours per week to help her needs and her goals and what they need to help her with to meet those goals."

[4] Mother was specifically asked about an incident related to N.P.'s birthday party that was detailed in the reports submitted to the juvenile court and admitted that contributed to her inability to reunify.

the juvenile court found that both parents had maintained regular visitation and contact with the children and both parents had established the existence of a substantial positive relationship with their children. However, the juvenile court found that the parents had failed to establish that any detriment that could be suffered by terminating parental rights outweighed the benefits of adoption.

Specifically, the juvenile court explained: "In this particular case, based on the whole history of the case and the continued domestic violence that has essentially continued throughout this whole case, including in front of the children, that the benefits of adoption and the stability of the grandparent's home, keeping the sibling relationship together, and any sibling relationship they have with any of their siblings who have already been adopted, that that stability in comparison with the instability based on the parents['] ongoing domestic violence, that it far outweighs any detriment the kids would suffer. And the two older children have been consulted and wish to be adopted."

The juvenile court ordered the termination of Mother and Father's parental rights and selected a permanent plan of adoption for the children. Mother and Father appeal from the order terminating their parental rights.

## III. DISCUSSION

The only claim of error asserted on appeal is that the juvenile court abused its discretion in determining that the parental-benefit exception set forth in section 366.26, subdivision (c)(1)(B)(i), did not apply. We conclude that the record does not show an abuse of discretion and affirm the order.

8

A. *General Legal Principles and Standard of Review*

"[T]he goal at the section 366.26 hearing is 'specifically . . . to select and implement a permanent plan for the child.' [Citations.] To guide the court in selecting the most suitable permanent arrangement, the statute lists plans in order of preference and provides a detailed procedure for choosing among them. [Citation.]" (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) "Where possible, adoption is the Legislature's preferred permanent plan . . . "' . . . because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.""" (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 814 (*Andrew M.*).)

"However, there are several exceptions to this rule. [Citation.] One such exception applies if '[t]he court finds a compelling reason for determining that termination would be detrimental to the child' because '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.'" (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 206 (*L.A.-O.*).) "[T]o establish the parental-benefit exception, a parent must prove three elements: '(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child.' [Citations.]" (*Ibid.*, italics omitted.)

The juvenile court's determination regarding the parental-benefit exception is reviewed under a hybrid standard of review. (*Andrew M.*, *supra*, 102 Cal.App.5th at p. 815; *Caden C.*, *supra*, 11 Cal.5th at pp. 640-641.) "'The first two elements involve factual determinations to which the substantial evidence standard of review applies. [Citation.] The final step, determining whether termination of parental rights would be detrimental to the child, is reviewed for abuse of discretion.'" (*Andrew M.*, at p. 815; *L.A.-O.*, *supra*, 73 Cal.App.5th at p. 206.) An abuse of discretion occurs when the juvenile court makes """""an arbitrary, capricious, or patently absurd determination""""" (*L.A.-O.*, at p. 207) such that """no reasonable person could agree with it."""" (*Andrew M.*, at p. 815.)

B. *Application*

In this case, the juvenile court found that Mother and Father had established the first two elements of the parental-benefit exception to termination of parental rights and parents do not challenge these findings on appeal. Instead, parents contend only that the juvenile court abused its discretion in determining that termination of parental rights would not be detrimental to the children. We disagree.

The juvenile court's determination with respect to the third factor of the parental-benefit exception to termination of parental rights is a "subtle, case-specific inquiry" that seeks to determine whether "the benefit of placement in a new, adoptive home outweigh[s] 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent].'" (*Caden C.*, *supra*, 11 Cal.5th at

p. 633.) In this case, the record discloses numerous factors that weighed in favor of finding that termination of parental rights would not, on balance, be detrimental to the children.

First, CFS documented repeated, ongoing domestic violence between parents. One such incident disrupted N.P.'s birthday celebration which was captured on an audio recording and another argument involved Mother directly arguing with M.P.[5] Thus, the record not only shows that parents had not resolved the issues that led to dependency, but also that these unresolved issues could continue to negatively impact the children. Potential ongoing negative effects from unresolved domestic violence is a factor that may weigh against finding detriment from severance of the parental relationship. (*Caden C.*, *supra*, 11 Cal.5th at pp. 637-638; *In re Katherine J.* (2022) 75 Cal.App.5th 303, 321-322 [ongoing substance abuse and domestic violence in the home diminishes the potential benefits a child may have from maintaining a parental child relationship]; *In re A.L.* (2022) 73 Cal.App.5th 1131, 1159 (*A.L.*) [juvenile court should consider parent's continued struggles with substance abuse to the extent it impacts the quality of any potential ongoing relationship with parent].)

---

[5] On the audio recording, the parents were heard yelling and cursing at each other and Ju.P. yelled at them to stop arguing. Father was apologetic about the incident. Mother was hostile and upset at the social worker when she was interviewed about the incident. Mother made veiled threats to the social worker by repeatedly saying, "'that is why social workers get hurt.'"

Second, N.P. was only two years of age at the time of the hearing and had been placed with maternal grandparents for almost the entirety of his life. The fact that a child is "very young and never lived with the parents" and "his only interactions with them were during hours-long visits" is a factor that weighs against finding detriment. (*Andrew M.*, *supra*, 102 Cal.App.5th at pp. 818-819.) While Ju.P. and M.P. were older and had lived with both parents prior to the dependency, both expressed a desire or willingness to be adopted when interviewed by social workers. Contrary to Mother's contention that this constituted an improper factor, this court has held that a dependent child's expressed desire to be adopted is a factor that can be considered when determining whether a child will suffer detriment from severance of a parental relationship. (*In re I.E.* (2023) 91 Cal.App.5th 683, 693-694 (*I.E.*).)

Third, although CFS documented appropriate and affectionate interaction between parents and the children during visits, the children did not have difficulty separating from parents when visits ended. The relative ease with which a child can be separated from a parent after visits is a factor that weighs against finding detriment. (*A.L.*, *supra*, 73 Cal.App.5th at pp. 1158-1159.)

Finally, CFS documented that the children had positive emotional bonds with maternal grandparents and were well adjusted in their prospective adoptive home. The existence of positive emotional bonds with a prospective adoptive family may be considered as a factor that weighs against a finding of detriment. (See *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1342 ["the juvenile court did not abuse its discretion by

12

considering the child's bond with his prospective adoptive parents or comparing this bond with the bonding between [the child] and his father"]; *In re Dy.P.* (2022) 76 Cal.App.5th 153, 168 [recognizing that a child can have emotional bonds to parents and caregivers and suggesting the juvenile court must balance these considerations instead of merely determining who has a primary bond].)

On appeal, Mother argues that the bonding study constitutes evidence weighing in favor of finding that severance of the parental relationship would be detrimental. We do not disagree. Indeed, the record shows that the juvenile court considered the bonding study, credited it as evidence that could support a finding that termination of parental rights could be detrimental, but ultimately determined that it did not outweigh the other factors suggesting that adoption would be more beneficial. However, under our applicable standard of review, a reviewing court is not authorized to "'substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) And we cannot conclude that the juvenile court's determination was arbitrary, capricious, or patently absurd given the numerous factors we have already identified that weighed against a finding that termination of parental rights would be detrimental to the children.

Finally, we briefly address Mother's contention that the juvenile court relied on improper factors by improperly considering preservation of the sibling relationships. We disagree with this characterization of the record. In referencing sibling relationships, the juvenile court did not profess to be motivated by a desire to maintain any specific sibling

13

relationship. Instead, the juvenile court made clear that it was comparing the emotional stability that the children derived from their relationships in comparison to the instability derived from their relationship with parents.[6] This is not improper. The juvenile court's weighing process should seek to determine "what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) This includes considering the extent to which the stability offered by a new home "may alleviate the emotional instability" caused by separation with a parent and the extent to which a new home may provide "a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Id.* at p. 633; see *I.E.*, *supra*, 91 Cal.App.5th at p. 693 [not improper to consider the extent to which a dependent child has adjusted to a prospective adoptive home and the emotional attachments the child may have to that home].) Here, the juvenile court could reasonably consider that any potential emotional instability caused to the children by a separation from the parents may well be alleviated by the source of stability offered by new prospective parents and their siblings. Thus, comparing the emotional stability offered by the prospective adoptive home with

---

[6] Specifically, the juvenile court's mention of sibling relationships was bookended by its express reference to stability, stating: "the benefits of adoption and the stability of the grandparent's home, keeping the sibling relationship together, and any sibling relationship they have with any of their siblings who have already been adopted, that that stability in comparison with the instability based on the parents['] ongoing domestic violence, that it far outweighs any detriment the kids would suffer."

the relative instability of the parental relationship does not constitute consideration of an improper factor.[7]

Because the record discloses numerous factors upon which the juvenile court could and did rely to conclude that any detriment posed by termination of parental rights would not outweigh the benefits of stability in an adoptive home, we cannot say that the juvenile court abused its discretion in reaching this conclusion. Where the record shows that the juvenile court's determination did not exceed the bounds of reason, we have no basis to reverse its order.

## IV. DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
                                                                    J.

We concur:

CODRINGTON
            Acting P. J.

MENETREZ
                J.

---

[7] We acknowledge that "[w]hen it weighs whether termination would be detrimental, the [juvenile] court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) However, consideration of a dependent child's *emotional* attachments to the extent they may provide stability in a child's life and minimize any detriment from severance of a parental relationship does not constitute a comparison of the parents' capabilities as custodial caretakers.

15